**SHOREHAM–WADING RIVER CENTRAL SCHOOL DISTRICT and Scientists and Engineers for Secure Energy, Inc., Petitioners,**

*v.*

**U.S. NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,**

**Long Island Lighting Company, Intervenor.**

**No. 90–1241.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 11, 1991.

Decided April 30, 1991.

As Amended April 30, 1991.

James P. McGranery, Jr., Washington, D.C., for petitioners.

Charles E. Mullins, Atty., Nuclear Regulatory Com'n, with whom William C. Parler, Gen. Counsel, John F. Cordes, Jr., Sol., and E. Leo Slaggie, Deputy Sol., Nuclear Regulatory Com'n, Richard B. Stewart, Asst. Atty. Gen., Edward J. Shawaker, Asst. Chief and Andrew C. Mergen, Atty., Dept. of Justice, were on the brief, for respondents.

Donald P. Irwin, with whom W. Taylor Reveley, III was on the brief, Richmond, Va., for intervenor.

Samuel A. Cherniak was on the brief, New York City, for amicus curiae.

Before EDWARDS, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Shoreham Nuclear Power Station is all dressed up with no place to go. For more than two decades, the Long Island Lighting Company ("Lilco") battled citizens, environmental groups, and federal, state, and local authorities for the right to build and operate the plant. Only a few days before the April 21, 1989 issuance of a full-power operating license by the Nuclear Regulatory Commission, see *Long Island Lighting Company*, 29 NRC 211 (1989), however, Lilco and the State of New York reached a settlement, under which Lilco agreed to sell Shoreham (for $1.00) to the Long Island Power Authority, an entity created by the New York legislature for the sole purpose of acquiring and dismantling the fully functional plant. See New York Public Authorities Law § 1020 *et seq.* (McKinney Supp.1991). Lilco reads the settlement agreement as absolutely forbidding it from ever operating Shoreham.

Since the settlement agreement became effective, Lilco has taken a variety of measures to reduce the costs of maintaining Shoreham, pending the transfer to the Power Authority. These include removing reactor fuel, reducing staff, and deactivating equipment not needed in the plant's defueled status.

Petitioners, Shoreham–Wading River Central School District, and Scientists and Engineers for Secure Energy, Inc. (known as SE₂), prefer that Shoreham be operated as a nuclear plant. Accordingly, they here attack two acts of the Nuclear Regulatory Commission which facilitate the cost reduction process, as well as a failure to act.

The challenged omission has become moot. At the time the petitioners filed their appeal here, the Commission had not acted on the School District's request for action under 10 CFR § 2.206 (since supplemented by the District and SE₂ eight times). Their claim was for relief against the Commission's failure to decide. On December 20, 1990, however, the Director of the Office of Nuclear Reactor Regulation issued his final decision. See *Long Island Lighting Co.* (Shoreham Nuclear Power Station, Unit 1), 32 NRC 469 (1990). The unlawful delay claim is therefore moot, and no attack on the merits of the § 2.206 claims is properly before us.

Petitioners also challenge two recent Commission responses to Lilco's cost reduction measures: First, so that it could base its handling of future developments at Shoreham on a legal premise conforming to the real state of the world (namely, a defueled reactor), the Commission issued a "Confirmatory Order" prohibiting Lilco from refueling Shoreham without prior Commission approval. See *Notice Re: Long Island Lighting Co., Shoreham Nuclear Power Station, Confirmatory Order Modifying License (Effective Immediately)*, 55 Fed.Reg. 12,758 (1990) ("Confirmatory Order").

Second, the Commission granted Lilco a partial exemption from a regulation that requires operators of nuclear generating facilities to keep $1.06 billion in property

damage insurance. See 10 CFR §§ 50.-54(w), 50.12(a) (1990). The exemption is conditioned on Shoreham remaining defueled and on Lilco maintaining insurance of $337 million—the amount set by the Commission for Shoreham during its period of low power testing. See *Notice Re: Long Island Lighting Co. (Shoreham Nuclear Power Station, Unit 1) Exemption from On–Site Property Damage Insurance Requirements of 10 C.F.R. § 50.54(w)*, 55 Fed.Reg. 18,993 (1990) ("Insurance Exemption").

Petitioners object to both orders in themselves, and further claim that they give rise to an obligation to prepare an environmental impact statement under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (1988).

We hold that the Confirmatory Order is not a final order subject to judicial review, except the aspect of the order making it "immediately effective". As to the latter, petitioners lack standing. We uphold the grant of the Insurance Exemption, and we find that neither of the actions reviewed here, considered separately or as parts of some aggregate, triggers a Commission obligation to prepare an environmental impact statement.

\* \* \*

■ The Hobbs Act, 28 U.S.C. § 2342(4) (1988), and § 189 of the Atomic Energy Act, 42 U.S.C. § 2239 (1988), authorize judicial review of certain "final" orders of the Commission. The Confirmatory Order, apart from the provision making it "immediately effective", is plainly not final. Where, as here, the order under attack is undergoing further agency review, see *Long Island Lighting Co. (Shoreham Nuclear Power Station, Unit 1 )*, 32 NRC 201, 209 (1990) (referring case to Licensing Board), agency action is not final. See, e.g., *United Transportation Union v. ICC*, 871 F.2d 1114, 1116–17 (D.C.Cir.1989); *Outland v. CAB*, 284 F.2d 224, 227 (D.C. Cir.1960).

In the Confirmatory Order the Commission specified that its ban on refueling would be "immediately effective". That feature of the order, akin to a district court's grant or denial of a preliminary injunction, is final for purposes of judicial review; it changes rights and obligations immediately rather than postponing legal effect until the administrative process is over. See *Commonwealth of Massachusetts v. NRC*, 924 F.2d 311, 322 (D.C.Cir. 1991). But petitioners lack standing to challenge it.

■ Petitioners represent people who live in the Shoreham area and assert environmental injury on their behalf. Their theory is that the ban on refueling lays the basis for *future* Commission orders granting Lilco further exemptions from the duties of a full-power licensee, and that these exemptions will pose environmental risks.[1] Article III standing requires not only that plaintiffs suffer or be threatened with a "distinct and palpable" injury, redressable by a favorable decision, but also that the injury be " 'fairly' traceable to the challenged action". *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Here, even if we assume that the future exemptions may pose an environmental risk, the expected future exemptions cannot inflict injury until the Commission issues them. While the ban on refueling may be a "but for" cause of any such future rulings and thus of any resulting risks, the exemptions themselves will be the operative causes. The link with the refueling ban is simply too remote.

\* \* \*

■ The Insurance Exemption is a final order as to which all administrative remedies have been exhausted. It is also consistent with the four requirements that are specified in Commission regulations on the granting of an exemption from the minimum property insurance requirements.

---

1. As only the immediate effectiveness of the Confirmatory Order is at issue here, the only future Commission orders relevant are those that might occur between the date of immediate effectiveness and the date of final agency adjudication of the merits of the Confirmatory Order (at which time the license modification would become effective in the absence of an immediate effectiveness finding, see 10 CFR § 2.204 (1990)).

Such an exemption must: (1) be "[a]uthorized by law", (2) "not present an undue risk to the public health and safety", (3) be "consistent with the common defense and security", and (4) be justified by "special circumstances". 10 CFR § 50.12(a)(1), (2).

The term "[a]uthorized by law" has been consistently interpreted by the NRC to require that the grant of the exemption not violate any law. See, e.g., *Specific Exemptions, Clarification of Standards*, 50 Fed. Reg. 50,764, 50,776/1 (1985). Petitioners accept that understanding, but claim a violation of § 182(a) of the Atomic Energy Act, 42 U.S.C. § 2232(a), which "commands the NRC to ensure that any use or production of nuclear materials 'provide[s] adequate protection to the health or safety of the public.'" See *Union of Concerned Scientists v. NRC*, 824 F.2d 108, 114 (D.C. Cir.1987) (*"UCS"*). The second condition for exemption mirrors § 182(a)'s requirement, merely substituting the non-existence of "undue risk" for the assurance of "adequate protection". These are concepts that the Commission uses interchangeably. See *id.* at 109. Thus, the Commission's compliance with the second condition (discussed next) defeats petitioners' argument.

Here the Commission found not only that the insurance exemption would impose no undue risk, but that it would have *"no significant effect on the safety of the public or the plant"*. Insurance Exemption, 55 Fed.Reg. at 18,994. Petitioners' only attack on that finding takes the oblique form of noting that the Commission used the $337 million figure because it had allowed that for the plant in its low-power testing phase, whereas now, petitioners exclaim, the plant has a *"full power* operating license". Reply Brief at 15 (emphasis in original). But that license is modified by the Confirmatory Order (about which petitioners gripe in their previous claim), which bars any refueling without the Commission's consent. The Commission's judgment that a completely defueled reactor is no more hazardous than one operating under a low-power license seems unexceptionable.

The Commission also made a finding that without an exemption Lilco would incur costs significantly in excess of those incurred by others similarly situated, and petitioners argue that this finding amounts to an unlawful consideration of economic costs in the assessment of what protection is adequate. See *UCS*, 824 F.2d at 114. But there is no indication that the Commission considered costs in making its finding that there would be "no undue risk"; the mere fact that it considered costs in finding "special circumstances" creates no conflict with *UCS*.

■ Petitioners also attack the finding that the exemption is "consistent with the common defense and security", arguing that decommissioning Shoreham will harm the nation's "energy security". Perhaps so. But there can be no serious contention that the insurance exemption, standing alone, has any effect on the energy security of the nation. Insurance only diminishes the impact of a loss by spreading it, so the only effect of the partial exemption would be to reduce that diminution. The effect on national security appears nil.

Finally, the Commission found "special circumstances" for granting the exemption, noting among other things that "[a]pplication of the regulation in [these] circumstances would not serve [its] underlying purpose" and that it would impose "undue hardship or other costs" exceeding those contemplated when the rule was adopted and those imposed on others similarly situated. See 55 Fed.Reg. at 18,994/1 (citing 10 CFR § 50.12(a)(2)(ii) & (iii)). Petitioners' only real attack here seems to be that in other instances the Commission demanded of licensees a more specific documentation of costs. But here the background fact of a $337 million insurance requirement during low-power testing suggests on its face that the burdens of a $1.06 billion requirement during the defueled period would be undue.

\* \* \*

■ Petitioners do not contend that the Confirmatory Order or the Insurance Exemption, standing alone, constitutes a "major Federal action[ ] significantly affecting

the quality of the human environment." See 42 U.S.C. § 4332(2)(C) (1988). (In fact, the Commission issued an "Environmental Assessment" and a "Finding of No Significant Impact" when it announced it was considering issuance of the insurance exemption. See 55 Fed.Reg. 6566.) Instead, they argue that the two actions are within the scope of an existing *de facto* decommissioning proposal, and thus may not be carried out until an environmental impact statement is completed on the proposal as a whole. See 10 CFR §§ 51.100(a), 51.14(b) (incorporating by reference 40 CFR § 1508.25(a)(1)(iii) (1990)). We have twice declined to rule on petitioners' claim that such a de facto decommissioning proposal exists, see Order of August 30, 1990 (partial dismissal in this case for lack of final agency action); Order of January 22, 1990 (dismissal of No. 89–1633 for lack of final agency action), and there is no need to resolve the matter now.

Even assuming a de facto decommissioning proposal, the Confirmatory Order and the Insurance Exemption are not "interdependent parts of a larger action [that] depend on the larger action for their justification." 40 CFR § 1508.25(a)(1)(iii) (1990). Neither action commits Lilco or the Commission to decommissioning or constrains their choices one whit. Should Lilco (or a successor) decide to operate Shoreham as a nuclear facility and obtain release from the bar of its settlement agreement with New York State, the Commission could simply reverse the Confirmatory Order and the Insurance Exemption. Lilco could then secure additional insurance coverage and begin refueling. Thus the two decisions cannot possibly be seen as unlawful segmentation of a decommissioning proposal to avoid NEPA obligations. They are simply means of avoiding a waste of resources in the meantime. See SECY–89–247 at 4 (Shoreham to be "preserved as a physical entity capable of being returned to service without untoward resource expenditure").

At oral argument, counsel for petitioners seemed to claim that because the two orders tended to *prevent* the accumulation of costs, they somehow biased the ultimate decision on decommissioning. The theory exhibits confusion on two levels. First, refraining from sinking costs associated with a given choice (full operation) is not the equivalent of sinking costs into an alternative. Second, sinking costs will bias a later judgment *only* insofar as the sunk costs reduce the future costs necessary to realize some option, and thus make it more attractive at the point of decision. For example, current expenditures adapting Shoreham to coal-fired use might well have that effect. But the money that petitioners would have Lilco throw away on unneeded insurance will not reduce the costs associated with a *future* decision to decommission; the appeal of such a decision will turn on the benefits and burdens it may be expected to produce.

\*　　\*　　\*

The very name of SE$_2$ (Scientists and Engineers for Secure Energy), as well as many of the assertions of counsel at oral argument, suggest that petitioners are here primarily because of a commitment to nuclear energy. Their belief seems to be that they advance that cause by raising a utility's costs of escape from a nuclear investment. They seem, as Lilco's counsel put it, to want to turn a license to operate into a sentence to do so. If so, their tack is almost certainly counter-productive. To the extent that they raise the costs of *exit* from the nuclear power industry, they necessarily raise the costs of *entrance;* any utility management contemplating the nuclear option must examine how costly it will be to escape if economic or other forces make that necessary. Blunderbus attacks of the sort made here can only aggravate those costs and chill utilities' interest in nuclear power.

\*　　\*　　\*

The petition for review is

*Denied.*